IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 23, 2001

**STATE OF TENNESSEE v. DONALD R. EADY, JR.**

**Direct Appeal from the Criminal Court for Bradley County**
**No. 97-528     Carroll L. Ross, Judge**

_____

**No. E2000-01152-CCA-R3-CD**
**December 4, 2001**
_____

The Defendant was convicted by a Bradley County jury of second degree murder. The trial court
sentenced him as a Range I standard offender to twenty-five years' incarceration. In this appeal as
of right, the Defendant argues (1) that insufficient evidence was presented at trial to support his
conviction; (2) that the trial court erred by failing to suppress his statement to police; (3) that the trial
court erred by allowing into evidence autopsy photographs of the victim; (4) that the jury considered
extraneous facts during deliberation and that the trial court erred in the manner in which it conducted
a post-trial voir dire of the jury concerning this matter; and (5) that he was improperly sentenced.
Having reviewed the record, we conclude (1) that sufficient evidence was presented to support the
Defendant's conviction for second degree murder; (2) that the trial court did not err by allowing the
Defendant's statement into evidence; (3) that the trial court did not err by admitting into evidence
autopsy photographs of the victim; (4) that the record does not support the Defendant's allegation
that jurors in his case were influenced by extraneous information and that the manner in which the
trial court conducted a post-trial voir dire of the jurors concerning this matter was not improper; and
(5) that the Defendant was properly sentenced. We thus affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and
THOMAS T. WOODALL, J., joined.

Eric S. Armstrong, Cleveland, Tennessee, for the appellant, Donald R. Eady, Jr.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Smith, Assistant Attorney General;
Jerry N. Estes, District Attorney General; and Shari Lynn Tayloe, Assistant District Attorney
General, for the appellee, State of Tennessee.

**OPINION**

In November 1997, the Bradley County Grand Jury indicted the Defendant, Donald Ray
Eady, Jr., for one count of second degree murder. In July 1998, following a trial, a Bradley County

jury found the Defendant guilty of the indicted offense. The trial court sentenced the Defendant as a Range I standard offender to twenty-five years' incarceration. The Defendant now appeals his conviction and sentence, raising the following issues for our review: (1) whether sufficient evidence was presented at trial to support the Defendant's conviction; (2) whether the trial court erred by failing to suppress the Defendant's statement; (3) whether the trial court erred by allowing into evidence autopsy photographs of the victim; (4) whether the jury considered extraneous facts during deliberation and whether the trial court improperly conducted a post-trial voir dire of the jury concerning this issue; and (5) whether the trial court failed to consider appropriate mitigating factors in sentencing the Defendant. Having thoroughly reviewed the record in this case, we affirm the judgment of the trial court.

## I. FACTS

The first witness to testify at the Defendant's trial was Officer David O'Boyle of the Bradley County Sheriff's Office. O'Boyle testified that on the evening of October 25, 1997, he was patrolling the eastern part of Bradley County when he received a dispatch "stating that . . . somebody was trying to give CPR [cardiopulmonary resuscitation] to a gentleman laying [sic] on Osment Road." O'Boyle testified that when he arrived at the scene, it was dark and "raining moderately." At the scene, he saw a gray car with the driver's side door open. Next to the car, he observed a "white female sort of hanging over an individual laying [sic] on the ground." The woman, later identified as Tracey Green, was attempting to perform CPR on the man on the ground, the victim in this case, while "yelling and screaming" at him. O'Boyle noticed that the victim had bruising on his chest, that "there were some blood marks," that the victim was in a prone position with his arms down to his sides, and that the victim was not reacting at all to Green.

O'Boyle approached Green and asked her, "[W]hat's going on?" In response, Green "started yelling and screaming . . . about a red Camaro and . . . two white guys shot him." She also screamed at O'Boyle "to start doing something for" the victim, so O'Boyle began to give the victim CPR. O'Boyle noted that the victim did not have a pulse. Soon, an off-duty nurse stopped at the scene, claiming he had heard about the situation on the mobile radio in his car, and the nurse took over CPR on the victim.

O'Boyle then led Green away from the scene, so as to prevent her from disrupting the nurse's work, and assisted her to his patrol vehicle. The officer noticed an odor of alcohol about Green and described her as drunk and disorderly at the scene. He testified that she was "hysterical" and explained that she was crying, shaking, "very loud; was cussing . . . [and was] very upset." O'Boyle recalled that she "kept repeating a partial [license] tag number, a red Camaro, and two . . . white males." Green told the officer, "All I know is a red Camaro pulled up, and the next thing I heard was gunshots . . . ." O'Boyle testified that while at the scene, he did not find any weapons in the vicinity of the victim.

Tracey Green testified that on the evening of October 25, 1997, she was with the victim, whom she identified as Curtis Cronk, and a friend named Eric Caywood. She stated that she and the

two men visited a bar called Grumpy's that evening, where they listened to a band and drank beer. Green recalled that she drank three beers during the course of the evening, that Caywood drank four beers, and that the victim drank "quite a few." Green testified that they left Grumpy's at 10:00 p.m. in her car.

Green testified that after leaving the bar, she first dropped off Caywood at his home and then drove the victim to Osment Road. There, she and the victim "stopped to talk." She explained that she and the victim, who was married, were involved in an extramarital affair, and on the night of the murder, she and the victim were discussing their relationship. Green stated that it was a dark, rainy night and that the only visible light came from a business down the road. Green recalled that shortly after they stopped on Osment Road, while the victim sat on the hood of her car and she leaned against the car, two cars drove by. Green testified that the second car, "a red TransAm or Camaro Firebird," stopped, backed up to her car, and then collided with her car. She and the victim jumped out of the way.

Green stated that after the collision, she and victim walked to the passenger's side of the car and asked the two men inside the car if they had insurance. She admitted that she "probably said, 'You, you hit my f__king car . . . .'" Green claimed that the passenger in the car told her there was nothing wrong with her car, and all parties checked the damage on the cars, which she described as "not bad." Green testified that the driver of the car said, "I'll take your car, bitch."

Green testified that she then took the keys from the ignition of the men's car, although she maintained that she did not know why she did so. Meanwhile, according to Green, the victim and the two men engaged in an argument, screaming at one another. Green stated that she "backed up" towards her car and said, "Just let us go. I've got your keys. Just let us go and we'll throw them in the ditch." She testified that she then heard "bap, bap, bap," and the victim said, "Oh, my God, they shot me." The victim began to walk towards her, taking a couple of steps before falling to the ground. According to Green, the men ran around him, demanding their keys, and she threw the keys at them. Green testified that the two men then drove away. As the car drove off, Green was able to see the license tag number.

Green stated that after the men left, she attempted to get the victim into her car, but was unable to do so because she could not pick him up. She then ran to a nearby building, hoping to find a phone, but she could not find anyone at the building. Green stated that she returned to the victim, and when she reached him, a car drove up. She told the driver to call 911 and then attempted to give the victim CPR. Green testified that eventually, Officer O'Boyle and a nurse arrived at the scene. She admitted that she was hysterical when they arrived.

Green described to police the two men that hit her car as follows: "[T]hey were younger guys, like early '20's . . . , and . . . they were about six feet tall, and . . . one of them had sort of a, like dirty dishwater blond, crewcut hair type, short hair, and . . . one of them had on a . . . white t-shirt and blue jeans, and the other one had on a dark shirt and blue jeans." She reported that she had never seen the men before October 25, 1997, and she stated that to her knowledge, the victim did not know the

men, either. In addition, Green reported that she did not have a gun in her car, and she stated that to her knowledge, the victim did not possess a gun on the night of the crime.

On cross-examination, Green testified that she remembered one of the two men initially saying that he was checking to make sure the victim was not hurting her. She could not recall which of the two men asked her whether she was alright. Green testified that in her statement to police, she recalled that the victim responded, "I ain't hurting her. We're just talking."

Detective Tony Alvarez of the Bradley County Sheriff's Office testified that he was the "case agent" for this case and explained that a case agent is "the primary investigator responsible for the investigation of [the] case." He stated that initially, police targeted Michael Shelton and another individual as suspects for the crime. Alvarez testified that Shelton confessed to being at the scene of the crime and to being one of the participants in the commission of the crime. Although Shelton identified the second individual as the shooter, police soon eliminated the second individual as a suspect. Alvarez reported that through their ongoing investigation, police eventually discovered that the Defendant was the second person at the scene and that the Defendant was the shooter. Shelton agreed to cooperate with police, telling police exactly what happened at the crime scene, and he led police to the gun used in the shooting. Shelton told police that the gun had been "tossed out" on Osment Road.

Alvarez testified that during the course of the investigation, he also interviewed Vanessa Starcher, a friend of the Defendant. Alvarez stated that Starcher made a "controlled call" for police to the Defendant, which police monitored and recorded. According to Alvarez, during the Defendant's conversation with Starcher, the Defendant attempted to establish an alibi as to his whereabouts on the night of the crime. Alvarez stated that the Defendant instructed Starcher to tell the police that he spent the evening of October 25, 1997 with her and that he never left her that night. Based on their investigation, the police arrested the Defendant in connection with the shooting death of the victim. Alvarez testified that after the Defendant was taken into custody, the Defendant gave a statement to the police in which he maintained that he was with Vanessa Starcher on the night of the crime.

Vanessa Starcher testified that she was "friends" with the Defendant and had known him several years. She stated that at some point after the crime, the Defendant told her that he and Michael Shelton were

> going out Osment Road, and there was a car parked on the side of the road and there was two people in it, a man and a woman. And they backed up to help them, and . . . they barely bumped the car. . . . And [Shelton] told [the victim] that it done [sic] more damage to his car than it did to [the other] car. And then the woman got out of the passenger side and come up and got the keys out of the driver's side, and looked at [the Defendant] and said that she'd throw the f__king keys over in the field. And then [the Defendant] got out and walked around to the back of the car. . . . [The Defendant] said . . . [the victim] was saying something to him, and then he pointed

the gun at him. And then [the victim] smacked the gun . . . and said, "What's this?"
and then [the Defendant] shot [the victim several] times in the chest.
Starcher testified that on the night of the shooting, she and the Defendant had sexual relations after he returned from Osment Road.

Starcher also testified that she allowed police to record a phone conversation that she had with the Defendant. She reported that during the conversation, the Defendant asked her "[t]o lie for him to get him out of trouble." The taped conversation was entered into evidence at trial.

Dr. Charles Warren Harlan, a forensic pathologist, testified that he performed an autopsy on the victim in this case. He testified that the victim had sustained multiple gunshot wounds and specified that he found a total of six wounds on the victim's body. Three of the wounds, all to the victim's extremities, were consistent with defensive wounds. Harlan reported that chemical analysis of the victim's blood and urine revealed that the victim had a blood alcohol level of 0.11 grams percent at the time of his death. He stated that "an individual will show alteration in reaction time and judgment at a blood alcohol level of 0.08 grams percent of ethyl alcohol or greater." The tests also showed the presence of marijuana in the victim's urine, indicating that the victim had used marijuana at some point during the eight weeks previous to his death.

Brandy Marie Swafford testified that Michael Shelton was her boyfriend. She stated that the Defendant was her friend and that she had known him less than a year. She recalled that on the day of the crime,[1] the Defendant, Shelton, and other friends visited her home, where they "shot some pool . . . and sat around." During the visit, the Defendant and Shelton borrowed her car, a 1986 TransAm which had her mother's license plate on it. Swafford explained that she used her mother's license tag because "the people [she] bought her car from never would give [her] a tag." Swafford recalled that the Defendant and Shelton left her home in her car and returned later that evening.

Swafford stated that when the Defendant and Shelton arrived back at her house, they were acting "scared" and nervous, and they were "talking real fast." Swafford testified that the Defendant told her that after he and Shelton left her house, they were driving down a road when they passed a car that they believed had "broke[n] down." She related the subsequent events as follows:
> They went past it. [Shelton] and [the Defendant] both decided that they was [sic] going to try to see if they could help the people, but instead of turning around, they just backed up. [Shelton] was driving. [Shelton] told [the Defendant] to roll down the window to see how far he had to go back. He didn't want to hit them, but they tapped into them anyway. . . . [Shelton] got out to talk to the man because . . . a man and a woman was [sic] outside their car. They got out and [Shelton] was talking to the man . . . . [T]he guy started cussing them because they hit the car.

---

[1] Swafford was asked whether she recalled the events of October 26, 1997, and provided the following testimony concerning that day. However, it is clear from the record that Swafford's testimony concerned events which, according to all other sources, took place on October 25, 1997.

Swafford testified that the Defendant told her that "the guy got smart with him and was cussing him and pushed him and smacked him, and [the Defendant] said that he thought he was going to do something, so [the Defendant] pulled the gun." Swafford testified that the Defendant claimed he shot the man. Swafford also reported that the Defendant told her he thought the man had a weapon.

Swafford testified that after drinking four or five beers and talking with Swafford and Shelton for a while, the Defendant related the story a second time. According to Swafford, the second time the Defendant related the events of the evening, he was still nervous, but "it was not really a big deal anymore." She maintained that the Defendant "bragged" about killing the man and implied that "it was [the victim's] stupidity for coming at [the Defendant] like that and he deserved it." Swafford also testified that the Defendant mimicked the man's actions after he was shot, "making fun of how he fell down screaming to his wife he's shot."

Michael Shelton, who reported that he was seventeen years old at the time of the crime, testified that he and the Defendant were friends and that the Defendant's brother was his "best friend." He recalled that on October 25, 1997, he, the Defendant, and other friends went to "Fantasy World" at approximately 8:00 p.m. to drink beer and to shoot pool. Shelton stated that they rode in his girlfriend's car. He stated that they left Fantasy World around 11:00 p.m. and went to a store to buy beer. They then went to an apartment to drink the beer. Shelton testified that he and the Defendant soon left the apartment in Swafford's car to go to a friend's house that was located off of Osment Road. Shelton reported that at the time, the Defendant's arm was in a cast due to a recent automobile accident, so Shelton was driving. He also recalled that his gun had been in the car all evening and that it was in the car when he and the Defendant left the apartment.

Shelton testified that it was dark and raining as he and the Defendant drove down Osment Road. He stated that he and the Defendant noticed a man walking down Osment Road, and soon afterwards, they saw a car and other people on the side of the road. Shelton stated that it looked as though the two people standing outside the car were "fighting." Thinking that the car belonged to the man they had seen, Shelton decided to stop to make sure the car was not broken down. As they backed up towards the car, however, Shelton "bumped into" the car.

Shelton reported that in response, the two people "come up to hit the passenger window, shouting and screaming." He stated that the people were "drunk" and smelled of liquor. Shelton testified that he got out of the car that he was driving, walked around it to assess the damage, and told the people that there was nothing wrong with their car. Shelton recalled that the woman then took the keys from his car, shouting, "You all ain't going nowhere." He stated that everyone at the scene was "cussing."

According to Shelton, the woman began walking down the road, and he followed her, asking her to return his keys. Shelton stated that he followed the woman "all the way down the road." When he turned back towards his car, Shelton noticed the Defendant getting out of the car. He testified that the Defendant "offered his insurance or something." The victim, who, according to Shelton, was barely able to walk and who had been "mumbling" to the Defendant until this point,

"started pushing [the Defendant]." Shelton testified, "Then [the victim] walked in [the Defendant's] face, and I . . . don't know what he said, but I know he smacked [the Defendant] a couple of times, or he was moving his arms up like that and I heard a pop and . . . [the victim] hit [the Defendant] in the face." Shelton reported that the Defendant responded by "pull[ing] a gun on" the victim and telling the victim to "back off."

Shelton testified that the victim "kind of backed off a little," but then began walking toward the Defendant again while holding his right arm behind his leg. Shelton maintained that as he walked toward the Defendant, the victim said, "Now I got one, motherf__ker," and the Defendant then shot the victim several times using Shelton's gun. Shelton recalled that after being shot, the victim turned around, began to walk towards his car, and said to his companion, "Baby, they shot me," before falling to the ground.

Shelton testified that the woman soon threw him the keys to his car, and he and the Defendant left the scene. He reported that he and the Defendant were "both just scared," and he stated that the Defendant "threw [the gun] out" of the car window while they drove back to the apartment. He testified that when they arrived at the apartment, he drank "a couple of beers" to relieve tension.

Shelton testified that police officers began to question him about the incident on the night of the crime, and he accompanied them to "the justice center" to give a statement. Shelton admitted that he initially lied to police by identifying someone other than the Defendant as the shooter. He claimed that he did so because the police told him that they "already got the guy who did it" and that the other individual had "already admitted to it."

The Defendant testified on his own behalf at trial. He stated that he was twenty-one years old at the time of the crime. He testified that in October 1997, he had a job at a cabinet shop, but was not working at the time of the crime because he had injured his hand in an automobile accident. The Defendant recalled that on October 25, 1997, he was visiting his mother, who lived in Cleveland, Tennessee, and he went to his cousin's birthday party there at an apartment complex. That evening, the Defendant and several others bought beer and drove to Fantasy World, where they "shot pool and listened to music." They then returned to an apartment to drink more beer. The Defendant testified that at approximately 11:00 p.m., he and Shelton left the apartment to drive to a friend's house that was located off Osment Road. The Defendant testified that on the way, they saw a "man walking off the road," and they guessed that the man was having "car trouble." As they rounded a corner, they saw a car "sitting in the road" and two people standing in front of the car. The Defendant testified that after passing the car, he told Shelton to stop to see if the people needed help. He recalled that Shelton stopped and backed up, accidentally "bump[ing]" the car.

The Defendant testified that the two people, whom he identified as Tracey Green and the victim, then "run [sic] up to [his] window, screaming and yelling and cussing at [him]." He reported that they were "pointing their finger[s] in [his] face." The Defendant testified that he told Shelton that they should leave, stating, "[t]here's going to be trouble," but Shelton wanted to see if he had

damaged Green's car. While Shelton got out of the car, the Defendant began looking for insurance information in his wallet. According to the Defendant, however, Green and the victim told him, "F__k you and your insurance, you little bastards. You're going to jail." The Defendant reported that the victim then walked to the back of the car and began "cussing [Shelton]" while Shelton attempted to reason with the victim.

The Defendant stated that during the commotion, Green "grabbed the keys out of the car." The Defendant testified that at this point, he decided to put Shelton's gun into his back pocket. He explained that he decided to carry the gun because his "left hand was broke in five places, and [he] . . . couldn't defend himself against a grown man."

According to the Defendant, as Shelton began to plead with Green to return his car keys, the Defendant walked to the back of their car to assess the damage to Green's car. He asked the victim to also look at the car, telling the victim that he could not find any damage to Green's car. The Defendant testified that the victim "walked over and started pushing on [him]." The Defendant reported that the victim then "slapped [him] in the face" and pushed him two or three more times. The Defendant testified that he told the victim to "back off and quit," but the victim slapped him again. The Defendant stated that he therefore "pulled the pistol out on him[,] . . . stuck the gun in his face and [] told him to back off." The Defendant recalled that he "stood there for a second," and then the victim asked, "What the f__k is that?" According to the Defendant, the victim "tried to slap the gun," but instead hit the Defendant's arm. The Defendant again told the victim to "back off," and the victim responded, "Oh. Okay. Okay." The Defendant testified that the victim then walked to Green's car as the Defendant lowered his gun, reached inside the car, and walked rapidly back toward the Defendant, saying, "Now I got one, motherf__ker." The Defendant stated, "When I seen his right hand come up, I fired two shots." The Defendant maintained that the victim was approximately two feet from the barrel of the gun when he fired the second shot, and he claimed that he believed his life was in danger at the time of the shooting.

The Defendant testified that after he shot the victim, the victim turned around, walked back to his car door, and squatted down. The Defendant recalled that Tracey Green then ran to him, asking what had happened, and the victim said, "Oh, God, baby, they shot me. They shot me." The Defendant testified that he was afraid and "just wanted to leave and get away from there," so he demanded the keys from Green, who tossed the keys under Shelton's car. The Defendant and Shelton obtained the keys and left the scene. The Defendant stated that on the way home, he threw the gun out of the car window. The Defendant testified that later that night, he told Vanessa Starcher and Brandy Swafford what had happened, but he denied that he ever joked about the shooting.

The Defendant admitted that he had spoken to Vanessa Starcher in a secretly taped phone conversation about Starcher acting as his alibi. He claimed that after the crime, Starcher approached his cousin "about being an alibi." He also admitted that he initially gave a false statement to police regarding his whereabouts on the night of the shooting. However, the Defendant maintained that he lied to police because he was afraid.

On cross-examination, the Defendant testified that he knew that "[i]t's wrong to kill someone." Nevertheless, he claimed that it was not wrong to kill the victim "after [the victim] implied to [the Defendant] that he had a weapon." He insisted that he was not at fault because of the victim's actions.

## II. ANALYSIS

### A. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the convicting evidence. The Defendant was convicted of second degree murder, which is defined, in pertinent part, as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). "'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result . . . .'" Id. § 39-11-106(a)(20). In his brief, the Defendant contends that "the facts that were developed at trial more closely support a finding of voluntary manslaughter rather than second degree murder." See id. § 39-13-211.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 2000).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

In this case, the Defendant never denied that he shot the victim. Rather, he contends that he acted "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). The State presented evidence that

the Defendant shot the victim after the men engaged in a verbal disagreement. Tracey Green testified that the victim did not have a weapon in his possession on the night of his death and that the shooting occurred after a relatively short verbal confrontation. Green did not witness any type of physical altercation between the victim and the Defendant prior to the victim's death. The Defendant himself testified that he put a gun in his pocket prior to emerging from his friend's car to speak to the victim, and he also stated that he pointed the gun at the victim during the altercation. Although the Defendant and Michael Shelton each testified that the victim physically accosted the Defendant and that the victim appeared to have a gun, this testimony was apparently discredited by the jury. It was within the jury's purview to determine whether the Defendant acted in a state of passion and whether he was adequately provoked to shoot the victim. See Liakas, 286 S.W.2d at 859; State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). The jury found that the Defendant did not act in a "state of passion," Tenn. Code Ann. § 39-13-211(a), but rather that he acted in a knowing manner. We may not disturb this finding on appeal. We conclude that sufficient evidence was presented at trial to support the jury's finding that the Defendant was aware that his conduct was reasonably certain to cause the victim's death. See id. § 39-11-106(a)(20). This issue is therefore without merit.

### B. Suppression of Defendant's Statement

The Defendant argues that the trial court erred by failing to suppress his statement to police. He claims that he did not voluntarily waive his rights prior to making the statement. In support of this argument, he points to the fact that he signed only part of part of the waiver of rights form provided by police: On the form, he provided his signature to indicate that he understood his rights; however, he refused to sign the second half of the form, which stated that he was voluntarily and willingly giving up his right to remain silent, that he did not wish to have a lawyer present during questioning, and that he was not coerced into giving his statement. Under the signature line for the second portion of the form, Detective Alvarez wrote the following: "Defendant refused to sign. Said he understood his rights and proceeded to give a statement to myself and Cpt. Burnett who led the interview."

At the hearing on the motion to suppress the Defendant's statement, Detective Alvarez testified that after refusing to sign the second half of the waiver of rights form, the Defendant indicated no hesitation to speak to police about the crime. Alvarez testified that the Defendant did not request a lawyer, and he maintained that he never felt that the police were proceeding against the Defendant's wishes by taking the Defendant's statement. Alvarez stated that the Defendant told police that he was unwilling to sign the second signature line, but he also told police that he was willing to provide a statement. In addition, Alvarez stated that there was "[n]o question in [his] mind" that the Defendant understood his rights at the time he made his statement.

The Defendant also testified at the hearing on the motion to suppress. He stated, "They read me my rights and asked me if I understood my rights, and I signed that I did understand my rights." With regard to the signature line that he refused to sign, the Defendant testified that he believed that "if [he] signed it . . . [he] signed his rights away; that [he] had to tell the detectives whatever he

knew." He stated that he believed that if he signed the second portion of the waiver of rights form, he "couldn't plead the 5th or remain silent; that [he] had to speak without a lawyer . . . ." The Defendant claimed that at the time he made the statement, he was "scared to death and really didn't know what to do or wasn't really thinking clearly." However, he also told the trial court that he did in fact understand his rights, and he testified that he made his statement with a full understanding of his rights. The Defendant further testified that he was twenty-one years old, that he could read and write, and that he had completed his G.E.D.

At the conclusion of the Defendant's testimony, the trial court overruled the Defendant's motion to suppress the statement. The court found that the Defendant understood his rights and "waived those rights, whether or not he signed a particular document." The court concluded, "[I]n looking at the totality of the circumstances, it's clear [the Defendant] understood what his rights were, and understanding those rights, he proceeded to give a statement to the detective."

When an evidentiary hearing is held on the merits of a motion to suppress, the State must demonstrate by a preponderance of the evidence that the Defendant's statements were voluntary, knowing and intelligent. State v. Andrade Bruce Williams, Jr., No. 01C01-9803-CR-00104, 1999 WL 191782, at *3 (Tenn. Crim. App., Nashville, Apr. 8, 1999) (citing State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980)). The trial court, as the trier of fact, is entrusted with determining the credibility of witnesses, as well as the weight and value of the evidence presented. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). In determining the admissibility of a confession, the totality of the circumstances must be examined. State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996). The confession "'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence . . . .'" Id. (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). The standard to be followed is whether "'the behavior of the state's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined . . . .'" Kelly, 603 S.W.2d at 728 (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961)).

A trial court's determination at a suppression hearing is presumptively correct on appeal. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). The reviewing court is bound by the trial court's findings of fact unless the evidence found in the record preponderates against these findings. Odom, 928 S.W.2d at 23. On review, the prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences therefrom. Id. However, this Court is not bound by the trial court's conclusions of law. State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998).

We conclude that the evidence in the record does not preponderate against the trial court's findings in this case. The Defendant himself testified at the suppression hearing that he gave a statement to police with a full understanding of his rights. We find no evidence of coercion, threats, violence, or other improper influence in the record. We further note that the absence of the Defendant's signature on the second portion of the waiver of rights form does not necessitate a finding that he refused to waive his right to counsel. See State v. Huddleston, 924 S.W.2d 666, 669-

70 (Tenn. 1996). We thus conclude that the trial court properly denied the Defendant's motion to suppress his statement to police.

## C. Autopsy Photographs

The Defendant next argues that the trial court erred by allowing into evidence autopsy photographs of the victim. He contends that the photographs constituted cumulative evidence, and he argues that the photographs were unduly prejudicial.

We first note that the Defendant has failed to include this issue in his motion for new trial. Generally, failure to include an issue in a motion for new trial waives consideration of the issue on appeal. See Tenn. R. App. P. 3(e); State v. Clinton, 754 S.W.2d 100, 103 (Tenn. Crim. App. 1988). Thus, the Defendant has waived this issue on appeal. Nevertheless, we will briefly address the merits of the issue.

The Tennessee Supreme Court has determined that the admissibility of photographs is a matter within the discretion of the trial court, and a trial court's ruling concerning the admission into evidence of photographs "will not be overturned on appeal except upon a clear showing of an abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "To be admissible, photographs must be relevant to some issue at trial and their probative value must outweigh their undue prejudicial effect, if any." State v. Gann, 733 S.W.2d 113, 115 (Tenn. Crim. App. 1987).

The Tennessee Rules of Evidence state that all relevant evidence is generally admissible. Tenn. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

In overruling the Defendant's motion to exclude the autopsy photographs, the trial court stated, "[A]s far as photographs go, . . . these are about as unobtrusive as I've ever seen. They are obviously taken in a very professional manner and . . . they don't show the victim's face or any other part, other than what I presume the doctor will be speaking about." Having reviewed the photographs at issue, we agree with the trial court's conclusions. The photographs are not particularly graphic. We also note that the photographs depict what Dr. Harlan described as "defensive wounds," and thus, the photographs are probative of whether the Defendant acted in self-defense, as he claimed at trial. We find no abuse of discretion on the part of the trial court in admitting the photographs into evidence.

## D.  Individual Voir Dire of Jurors

The Defendant next contends that the jury considered extraneous facts in arriving at its verdict.  The Defendant further argues that the trial court erred in the manner in which it conducted a post-trial voir dire of the jurors concerning this issue.

After his trial, the Defendant filed a "Motion for Leave to Interview Jurors."  In support of the motion, the Defendant filed an affidavit in which he stated that when the jury retired to begin deliberations, he was placed in a holding room in the courthouse where his trial occurred.  The Defendant claimed that while he was in the holding room, he overheard "one of the jurors . . . say in deliberations that he had read in the paper that [the Defendant] had killed a man before as a juvenile and that he was going to convict no matter what."  In his motion for new trial, the Defendant stated, "One or more jurors are believed to have interjected extraneous information about the Defendant's prior criminal record which was improper and not evidence introduced properly at trail [sic].  This is believed to have influenced the jury's verdict in a manner which was unfairly prejudicial to the Defendant."

After the Defendant filed his affidavit regarding this matter, the trial court denied the Defendant's motion to interview jurors.  However, the Defendant filed a motion to reconsider and filed a second affidavit by an attorney who stated that while he was in the hallway of the courthouse in which the Defendant's trial was held, he overheard a man tell another individual: "he was convicted of second degree murder," and "the guy had been convicted of killing a man when he was sixteen."  The trial court subsequently granted the Defendant's motion to reconsider and conducted a hearing on the matter on September 2, 1998.[2]

At the hearing, the trial court, over objection by the Defendant, advised each juror of his or her rights before questioning the jurors about this issue.  The court reasoned that if a juror admitted to having knowledge of the Defendant's past record and if it became apparent that the juror had failed to disclose that knowledge during voir dire prior to trial, the State could possibly elect to prosecute the juror for perjury.  The court concluded that it had no choice but to advise the jurors of their rights "if the end result is that [this proceeding] could result in a prosecution against them."

The Defendant first complains that the jury in his case was influenced by extraneous information.  At the hearing conducted on this matter, some of the jurors who were questioned informed the court that they learned of the Defendant's prior conviction after the trial.  However, none of the jurors who were questioned indicated that they had any knowledge of the Defendant's

---

[2] Tennessee Rule of Evidence 606(b) provides, in pertinent part, as follows:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or the effect of anything upon any juror's mind or emotion as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention . . . .

Tenn. R. Evid. 606 (b).

prior juvenile conviction during trial or at the time of jury deliberations. Moreover, none of the jurors recalled the subject arising during deliberations. In fact, some of the jurors stated that they had no knowledge of the Defendant's prior record until they were informed of it at the hearing. Thus, we agree with the trial court's conclusion that "absolutely no foundation" exists to support the Defendant's allegations of juror misconduct.

The Defendant, however, also challenges the manner in which the trial court conducted the hearing on this matter. He complains that it was not necessary for the trial court to inform each juror of his or her rights before questioning them because "a right to counsel had not even attached." In his brief, the Defendant states, "The only thing that the court accomplished in conducting voir dire in the manner it did was to create an atmosphere of tension, which chilled any hope of getting at the truth." In addition, the Defendant contends that the trial court erred by not questioning four of the jurors who convicted him.

The Fifth Amendment to the United States Constitution provides in part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Miranda warnings are intended to protect a person's privilege against self-incrimination. See Miranda v. Arizona, 384 U.S. 436, 478-79 (1966). Miranda warnings are required when a person is subject to custodial interrogation by law enforcement. See id. "Custodial" means that the subject of questioning is in "custody or otherwise deprived of his freedom by the authorities in any significant way." Id. at 478. "Interrogation" has been interpreted to refer to questions that law enforcement officers should know are reasonably likely to elicit an incriminating response. Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

In this case, the court provided Miranda warnings not for individuals already accused of crimes, but for jurors acting as witnesses in court. However, we find no error by the trial court in advising the jurors of their rights prior to questioning them. The Tennessee Supreme Court has concluded that "where there is a conflict between the basic right of a defendant to compulsory process and the witness's right against self- incrimination, . . . the right against self-incrimination is the stronger and paramount right." State v. Dicks, 615 S.W.2d 126, 129 (Tenn. 1981). Furthermore, a trial court has wide discretion as to the proceedings before it. State v. King, 40 S.W.3d 442, 449 (Tenn. 2001). The court in this case opted to inform the jurors of their rights out of an abundance of caution, and we conclude that the trial court's decision to do so was not an abuse of its discretion.

We also conclude that the trial court did not abuse its discretion by failing to question every juror that served for the Defendant's trial. The record indicates that a few of the jurors were unavailable for the post-trial proceedings, and the trial court thus proceeded without them. Given that all other jurors who were questioned during the post-trial proceedings denied any knowledge of the Defendant's prior criminal history at the time of deliberations and that some of the jurors even expressed surprise at learning of the Defendant's prior conviction, we are satisfied that the Defendant

suffered no prejudice as a result of the trial court's failure to question every juror that sat for his trial. We conclude that this issue is therefore without merit.

### E. Sentencing

Finally, the Defendant argues that he was improperly sentenced. He contends that the trial court failed to consider appropriate mitigating factors in sentencing him and that the trial court erred by sentencing him to the maximum sentence within his range. The Defendant specifically argues that the trial court should have applied mitigating factors (2), (3), (8), (11), and (13). See Tenn. Code Ann. § 40-35-113(2), (3), (8), (11), (13).

When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The Defendant was convicted of second degree murder, a Class A felony. See Tenn. Code Ann. § 39-13-210(b). Because the Defendant was sentenced as a Range I standard offender, the appropriate range for his sentence was between fifteen and twenty-five years. See id. § 40-35-112(a)(1). The presumptive sentence for a Class A felony is the midpoint of the sentencing range unless there are enhancement or mitigating factors present. Id. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996). Because the record in this case indicates that the trial court adequately considered the enhancement and mitigating factors as well as the underlying facts, our review is de novo with a presumption of correctness.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

In sentencing the Defendant, the trial court applied two enhancement factors: enhancement factor (8), that "[t]he defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community," Tenn. Code Ann. § 40-35-114(8), and enhancement factor (20), that "[t]he defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult," id. § 40-35-114(20). The record supports the imposition of both of these enhancement factors.

The trial court then considered proposed mitigating factors. It rejected mitigating factor (2), that "[t]he defendant acted under strong provocation," id. § 40-35-113(2), and mitigating factor (3), that "[s]ubstantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense," id. § 40-35-113(3). The court explained its reasoning as follows:

> As I recall the testimony, [the Defendant and Michael Shelton] backed into this guy's car. He jumped out and was very upset and demanded to know if they had insurance. Probably everybody in this county would ask that same question and be angry under those circumstances. I don't think we can start shooting people because they get out and are upset and ask if you have insurance in an automobile vehicle.

The trial court next considered mitigating factor (8), that "[t]he defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense." Id. § 40-35-113(8). The court stated,

> The defendant suggests that his broken arm in some way is a mitigating factor. Again, . . . as I recall, the defendant was a passenger in the vehicle. The victim was upset at the driver and they had some words and there was no indication that he ever threatened to harm . . . the defendant, and I don't doubt he was angry and I don't doubt he was carrying on in a belligerent fashion. I just don't think under these circumstances that that's grounds to kill somebody.

-16-

Although the Defendant testified that the victim physically threatened him, the trial court obviously gave this testimony little weight. It is proper for the trial court to determine the credibility of a witness. See Odom, 928 S.W.2d at 23.

The trial court then considered mitigating factor (11), that "[t]he defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct." Id. § 40-35-113(11). With regard to this factor, the court made the following comments: "I don't see any evidence that showed that [the Defendant] had no sustained intent to violate the law. If you kill a man, to me that's a pretty clear intent. And again, we're . . . sitting here today with a jury verdict saying that he has committed second degree murder."

Finally, the trial court considered mitigating factor (13), the catchall provision. See id. § 40-35-113(13). At the sentencing hearing, the defense presented testimony by a couple, Susan and Doug Jacquith, with whom the Defendant lived at the time of the crime. Mrs. Jacquith, who testified that she was director of the Bradley Group Home, stated that she and her husband took the Defendant into the group home and later into their own home following his conviction for voluntary manslaughter as a juvenile. She testified about the Defendant's history of physical abuse at the hands of his family, the difficulties that the Defendant had as a result of the abuse, and his remorse for the crime now at issue. Mr. Jacquith testified that the Defendant is a skilled carpenter and that he had a job at a cabinet shop at the time of the crime. He stated that while the Defendant lived with his family, the Defendant did not display any problems, and he described the Defendant as helpful and cooperative. With regard to this testimony, the trial court stated,

> [The Defendant] has brought the Jacquiths here today and they have given very good testimony in his behalf . . . . [I]n effect, what they have said is they care a lot for this guy and wish better things could have happened to him during his life. It's obvious if he had had good folks like Mr. and Mrs. Jacquith . . . a longer period of time in his life, he might not be here today. And . . . certainly my heart goes out to both of them, and I think they have very heartfelt feelings for this young man in their willingness to come here today and express the fact that they do care for him. That does not, however, rise to the level of a mitigating factor. And as much as I appreciate their willingness to come and speak for this young man, I cannot accept that as a mitigating factor in his behalf. It's evident that this defendant, while he was in their house, pretty much under their control, tried to behave himself. It's evident when he's not under some kind of degree of control, he doesn't behave himself, and that's why we're here today. If he had been home with them that night, none of this would have happened. The point is, he wasn't home with them. He can't stay with them, any more than anybody can sit with someone their entire life just to insure that something doesn't happen. He was tried and convicted on an action he committed while he was out, in effect, in the real world. . . . [W]e're talking about a man that at this time was not 21 years old barely when this occurred and had already taken two lives in his . . . very, very short life; all taken – shooting someone with a gun, reacting, lashing out in anger.

The court concluded,

Because of the severity of [the Defendant's] past convictions, . . . I just don't know how many lives a person is allowed to take before they are faced with the full extent of punishment of the law. This is one Court that's not willing to give him another crack at someone else's life. Based upon those enhancement factors, the severity of the acts on which the Court finds those enhancement factors, the Court sentences him to the full range of 25 years, and commits him to the Tennessee Department of Corrections to serve.

Although the Defendant contends that the trial court failed to consider appropriate mitigating factors, it is clear from the record that the trial court conducted a thorough analysis of each mitigating factor proposed by the Defendant. However, the court ultimately rejected each of the proposed mitigating factors. Having reviewed the record, we agree with the trial court's findings concerning each mitigating factor proposed by the defense. As previously stated, the weight to be given each factor is within the discretion of the trial judge. Shelton, 854 S.W.2d at 123. The trial court applied two enhancement factors, which it granted substantial weight, and found no mitigating factors. We conclude that the Defendant's sentence is adequately supported by the record and that it complies with the purposes and principles of the 1989 Sentencing Reform Act. See Moss, 727 S.W.2d at 237. We therefore decline to modify the Defendant's sentence.

Accordingly, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE